U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 SEP 30  AM 11: 42

CLERK

BY_____(Aw)_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RALPH MOORE,                                )
                                            )
          Plaintiff,                        )
                                            )
     v.                                     )
                                            )
VICTOR BITCA, *in his individual capacity*, )   Case No. 2:19-cv-00035
JENNIFER MORRISON, *in her individual*      )
*capacity*, and TOWN OF COLCHESTER,         )
                                            )
          Defendants.                       )

**OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY**
**JUDGMENT AND GRANTING IN PART DEFENDANTS'**
**MOTIONS TO DISMISS**
(Docs. 6, 7, 8, 29, 30, & 31)

Plaintiff Ralph Moore brings this suit pursuant to 42 U.S.C. § 1983 against Town

of Colchester Police Officer Victor Bitca ("Defendant Bitca"), former Town of

Colchester Chief of Police Jennifer Morrison ("Defendant Morrison"), and the Town of

Colchester (the "Town") (collectively, "Defendants"), arising from a March 7, 2016

traffic stop which led to Plaintiff's arrest.

**I.     Procedural Background.**

Plaintiff alleges three causes of action against Defendants: (1) violation of

Plaintiff's Fourth Amendment rights pursuant to 42 U.S.C. § 1983 on the ground that

Defendant Bitca unlawfully prolonged the traffic stop into a drug investigation, resulting

in an unconstitutional seizure (Count I); (2) violation of the Fourteenth Amendment's

Equal Protection Clause under 42 U.S.C. § 1983 on the basis that Defendant Bitca acted

pretextually based on Plaintiff's race (Count II); and (3) violation of the Vermont

Constitution, ch. I, art. 11 arising from Defendant Bitca's allegedly unlawful directing of

Plaintiff to exit the vehicle which was the subject of the traffic stop (Count IV). For all

three claims, Plaintiff asserts that the Town and Defendant Morrison had a policy, practice, and custom of failing to instruct, supervise, and train Defendant Bitca and that they sanctioned *de facto* unlawful policies, practices, and customs related to seizures and racial discrimination. Plaintiff further contends that the Town violated Title VI of the Civil Rights Act by implementing a policy, practice, and custom of unlawfully discriminating against individuals on the basis of race, both directly and under the doctrine of *respondeat superior* (Count III). Plaintiff seeks declaratory relief in addition to compensatory and punitive damages as well as an award of attorney's fees and costs.

On April 29, 2019, Defendants moved to dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6) (Docs. 6-8) and Defendants Bitca and Morrison further sought dismissal of the claims against them on the grounds of qualified immunity. Plaintiff opposed the motions to dismiss on June 14, 2019, and Defendants replied on July 12, 2019.

In support of their motions, Defendants relied upon a video and audio recording of the traffic stop taken by Defendant Bitca's dashboard camera, which purportedly captured the driver, Nakita Brace, providing consent to a search of the Cobalt. Plaintiff's Complaint, in contrast, asserts a belief that no video exists.[1] To determine whether there was recorded evidence of the traffic stop, at a September 30, 2019 hearing, without objection, the court converted Defendants' motions to dismiss Plaintiff's Fourth Amendment claim into motions for partial summary judgment and granted the parties sixty days to conduct discovery on Plaintiff's Fourth Amendment claim.

On February 26, 2020, Defendants moved for partial summary judgment on Plaintiff's Fourth Amendment claim (Count I). (Docs. 29-31.) On May 11, 2020, Plaintiff opposed Defendants Bitca's and Morrison's motions for partial summary judgment but did not oppose the Town's motion for partial summary judgment. Because Plaintiff's opposition pertains equally to the Town's arguments, the court will treat the Town's

---

[1] *See* Doc. 1 at 4 n.2 ("Upon information and belief, there is no video or audio recording of Ms. Brace's alleged consent to search her vehicle prior to the extended seizure of Ms. Brace and Mr. Moore as they waited for back-up to arrive.").

motion for partial summary judgment as opposed. Defendants filed replies on May 26, 2020, at which time the court took the pending motions under advisement.

Plaintiff is represented by Robert J. Appel, Esq. Defendants are represented by Michael J. Leddy, Esq.

## II.    Standard of Review for Summary Judgment.

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (citations omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court must deny summary judgment. *Id.* at 251-52.

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "A non-moving party cannot avoid summary judgment simply

3

by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

## III.   Plaintiff's § 1983 Claims and Qualified Immunity.

Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983, which is "not itself a source of substantive rights[,]" but a vehicle "for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)) (internal quotation marks omitted). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)) (internal quotation marks omitted). In this case, Plaintiff grounds his constitutional violation on the Fourth Amendment's prohibition of unreasonable searches and seizures. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures[] shall not be violated[.]"). It is undisputed that Defendant Bitca was acting at all times under the color of state law.

Defendants argue that Plaintiff has failed to proffer admissible evidence of a Fourth Amendment violation because the March 7, 2016 traffic stop was supported by a reasonable suspicion of criminal activity. Defendants Bitca and Morrison further assert that even if the court finds a constitutional violation, they are entitled to qualified immunity because the right Plaintiff seeks to vindicate is not clearly established.

"When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established

4

at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d
129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "If the
facts, viewed in [the] light [most favorable to the plaintiff], do not establish a violation of
a constitutional right, 'there is no necessity for further inquiries concerning qualified
immunity,' and the officer is entitled to summary judgment." *Gilles v. Repicky*, 511 F.3d
239, 244 (2d Cir. 2007) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)).

## IV.    The Factual Record.

### A.    Whether to Disregard Plaintiff's Statement of Disputed Material Facts.

Although Plaintiff filed a Statement of Disputed Materials Facts, he did not
respond directly to each paragraph of Defendants' Statement of Undisputed Material
Facts. As a result, Defendants claim that Plaintiff has admitted to every fact they have
asserted.

"All material facts in the movant's statement of undisputed facts are deemed to be
admitted unless controverted by the opposing party's statement." *Rotman v. Progressive
Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013). Pursuant to Fed. R. Civ. P. 56(e), a
court may consider a fact "undisputed for purposes of the motion[]" for summary
judgment "[i]f a party . . . fails to properly address another party's assertion of fact as
required by Rule 56(c)[.]" *Id.* at (e)(2). The District of Vermont's Local Rule 56(b)
provides that "[a] party opposing summary judgment . . . must provide a separate, concise
statement of disputed material facts." *Id.* This statement must be responsive to the
moving party's statement. If it is not, it impairs the court's ability to determine whether a
fact is disputed and contravenes the expectation that courts will not "hunt through
voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258
F.3d 62, 74 (2d Cir. 2001).

Even if Plaintiff had submitted a compliant statement of disputed facts, however,
Defendants' "allegations of uncontested fact cannot be deemed true simply by virtue of
their assertion" in a Rule 56 Statement of Facts because an opposing party's
noncompliance with a procedural rule "does not absolve the party seeking summary
judgment of the burden of showing that it is entitled to judgment as a matter of law[.]"

*Holtz*, 258 F.3d at 73-74.

To the extent that Plaintiff has not directly responded to Defendants' identification of an undisputed fact, the court will consider it admitted. However, it will not grant summary judgment by default. *See Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (finding error in the district court's grant of summary judgment "solely for failure to file opposing papers" without "assess[ing] whether the defendants had met their burden to demonstrate that summary judgment was appropriate"); *Chaney v. Stewart*, 2015 WL 1538021, at *1 n.2 (D. Vt. Apr. 7, 2015) (considering plaintiff's statement of disputed material facts even though plaintiff "proffers additional facts and makes legal arguments in his Statement" instead of "contradicting the factual statements made in [defendant's] Statement of Undisputed Material Facts" and admitting as true undisputed facts plaintiff did "not respond to or controvert").

## B. Whether the Court May Consider Certain Contested Documents.

Defendants object to consideration of several of Plaintiff's exhibits, consisting of news articles provided only through links to websites, dashcam video and audio recording from another officer's police cruiser, and a chart of Vermont's traffic data. A party may support a factual assertion made in a motion for summary judgment by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). If the cited materials are not themselves admissible at trial, the court may consider "the content or substance of otherwise inadmissible materials where 'the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (alterations in original) (quoting 11 James Wm. Moore et al., *Moore's Fed. Practice* § 56.91[2] (3d ed. 2015)); *see also Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (holding "the material may be presented in a form that would not, in itself, be admissible at trial.") (citation and internal quotation marks omitted).

6

### 1.   Website Links and Information.

Defendants challenge the admissibility of several website links because copies of the documents associated with the website links are not included in Plaintiff's submission and because the websites are unauthenticated hearsay. For example, Plaintiff proffers an article from *The Washington Post* dated April 21, 2015 and an article from the *Virginia Police Bulletin* from August of 2015 to support his argument that the Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. 348 (2015), was clearly established law at the time of the traffic stop at issue. These newspaper articles are inadmissible because "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established" for the purposes of qualified immunity. *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013) (asking in clearly established inquiry whether "the Supreme Court or the Second Circuit affirmed the rule" at issue) (internal quotation marks omitted); Fed. R. Evid. 401(b) (stating evidence is relevant if "the fact is of consequence in determining the action").

### 2.   Officer Wyskiel's Dashboard Camera Recording.

Defendant Bitca contests the admissibility of Plaintiff's Exhibit 4, an audio and video recording from Town police officer Jeremy Wyskiel's ("Officer Wyskiel's") dashboard camera of the traffic stop of a green Subaru. It is undisputed that the traffic stop depicted in the recording is part of the same investigation as Defendant Bitca's challenged traffic stop. The recording reveals the extent to which Officer Wyskiel possessed and made available certain information to Defendant Bitca which, in turn, may be considered under the collective knowledge doctrine.[2] *See Oliver v. Woods*, 209 F.3d 1179, 1190 (10th Cir. 2000) ("Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to

---

[2] Under the collective knowledge doctrine, "for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" *Savino v. City of N.Y.*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)).

justify an investigative detention[.]"). The Wyskiel dashboard camera recording is therefore admissible.[3]

### 3.     Traffic Data.

Finally, Defendant Morrison objects to Plaintiff's Appendix A, an analysis of data collected with regard to motor vehicle stops in the Town, contending it is irrelevant and unfairly prejudicial hearsay. Plaintiff counters the chart is "derived from publicly posted data as analyzed by [University of Vermont] Professor Stephanie Seguino[.]" (Doc. 39 at 3.) Because there is no attestation as to the accuracy of the chart's contents and no evidence as to the reliability of the data contained therein, it is not clear "that the matter in question is what its proponent claims." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (quoting Fed. R. Evid. 901(a)).

Even if Appendix A was properly authenticated, it remains irrelevant to Plaintiff's claims because there is no evidence that Defendant Bitca knew the race of the occupants of the vehicle prior to the traffic stop and because Appendix A aggregates traffic data from 2014 through 2018 and does not separate out data pertaining to traffic stops that occurred prior to March 7, 2016. More importantly, traffic data is not relevant for summary judgment purposes because whether Defendants were on notice of certain traffic data does not establish either a constitutional violation or satisfy the "clearly established" prong of a qualified immunity analysis. *See Ross v. Corr. Officers John & Jane Does 1-5*, 610 F. App'x 75, 77 (2d Cir. 2015) (holding defendant correctional officer was entitled to qualified immunity because there was no "controlling precedent" that clearly established that defendant's conduct violated clearly established statutory or constitutional rights).

For the foregoing reasons, Plaintiff's Exhibit 4 (Officer Wyskiel's dashboard camera recording) is admissible, and the remaining contested exhibits are not.

---

[3] As Plaintiff points out, there is no apparent means to synchronize the two cruiser videos to determine the precise chronology of the combined events.

## C.     Whether the Court May Consider Statements of Fact Without Record Citations.

Defendant Bitca challenges Plaintiff's Statement of Disputed Facts on the ground that certain alleged factual disputes are not supported by record evidence. For example, Plaintiff states without citation that he and Ms. Brace "did not match the description provided to police as [Plaintiff] did not have long hair, nor was he wearing boots nor a blue jacket although he is in his thirties as the caller described the male in question." (Doc. 38-1 at 2, ¶ 2.) As Defendant Bitca testified that neither Ms. Brace nor Plaintiff matched the description of the trespasser, Plaintiff's failure to cite record evidence in support of this contention is excused. With regard to any remaining unsupported factual assertions, under Fed. R. Civ. P. 56(c)(1), "[a] party asserting that a fact . . . is genuinely disputed must support the assertion" through either citation to the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* Without a record citation, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). The court thus does not credit any disputed facts unsupported by record evidence. *See Deanda v. Hicks*, 137 F. Supp. 3d 543, 564 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion.").

## D.     The Undisputed Facts.

### 1.     Defendant Bitca's Employment and Training.

Defendant Bitca is a certified full-time police officer employed by the Town Police Department since January 30, 2015. He is presently assigned as a detective. At the time of the traffic stop on March 7, 2016, Defendant Bitca had been a law enforcement officer for over two-and-a-half years and had been the primary investigating officer on several cases, including approximately ten incidents that resulted in the seizure of illegal drugs or drug paraphernalia. Apart from Plaintiff's claim, no complaints have been filed against Defendant Bitca while employed by the Town.

9

Defendant Bitca has received training in a variety of subject matters related to law enforcement, including Fourth Amendment search and seizure procedures, and has been "trained to be on the lookout for behavior, actions[,] or words that are indicative of criminal conduct." (Doc. 29-2 at 1, ¶ 3.) As a result of his training and experience as a police officer, Defendant Bitca is aware "that certain movements, such as leaving an area quickly when law enforcement arrives, may be indicative of criminal behavior[,]" that "an individual changing their story" may be indicative of deception, and a "nervous reaction to a law enforcement encounter" may be indicative of deception or criminal behavior. (Doc. 29-1 at 2, ¶¶ 3-5.)

The Town Police Department regularly provides training to its police officers regarding Fourth Amendment searches and seizures, including trainings on legislative and judicial changes to the law that directly impact police work. Town police officers also receive Fourth Amendment search and seizure training at the Vermont Police Academy ("VPA"), and all new officers are issued a Field Training Manual addressing "many aspects of search and seizure" as well as training on this topic. (Doc. 29-5 at 5.) Following graduation from the VPA, "there are no mandated courses thereafter solely specific to search and seizure[,]" *id.*; however, each year, Town police officers are required by the Vermont Criminal Justice Training Council to participate in a minimum of thirty hours of certified or certifiable in-service training, some of which "touch on" Fourth Amendment search and seizure. *Id.* at 6.

Defendant Bitca attended Fourth Amendment search and seizure trainings while at the VPA, nonetheless, "[i]t is difficult to determine whether [Defendant] Bitca received any training specific to the *Rodriguez v. United States* decision by name or to the specific facts of that case[:]"

> For instance, [Defendant] Bitca has participated in trainings titled Administrative Update, which include training on updates and changes in the law. This training as well as other trainings likely included 'takeaways' from the *Rodriguez* decision and others. [Defendant] Bitca did receive information and updates on the holding in *Rodriguez* through informal discussions with personnel at the [Town] Police Department.

*Id.* at 3-4. Defendant Bitca could not identify any specific training he received addressing the Fourth Amendment after his graduation from the VPA.

At the time of the traffic stop, the Town Police Department's policy titled "Criminal Investigations" or General Order # 6 stated: "Investigations, searches, seizures, arrests[,] and all uses of law enforcement authority shall be done in compliance with constitutional guidelines, department general orders[,] and the officer's training." (Doc. 29-6 at 1.) General Order #6 refers to and incorporates by reference a document published by the State of Vermont titled "An Introduction to Vermont Criminal Law" which was not included in the parties' submissions.

### 2. Reports of "Possible Drug Activity" in the Town.

On February 9, 2016, the Town Police Department received an email from Ptl. Christopher Jones titled "Possible Drug Activity 16CC001367[.]" (Doc. 29-3 at 1.) This email was disseminated to all Town police officers including Defendant Bitca, who reviewed the email, which states as follows:

Erica called to report witnessing what she believes [is] drug dealing in the parking lot of Cumberland Farms on College Parkway on both Sunday and Monday mornings between 0900 and 0930 hours.

Erica said that on Sunday 2-7-16 she . . . observed a Silver Quick Cab pull into the Cumberland Farms. She said another car pulled up to it, then the quick cab left and went to the parking lot near Dunkin Donuts.

On Monday she observed a Shearer Chevrolet VW service van pull in, and then observed a Blue Subaru Outback pull in. She said both operators exited and met in the parking lot. She said she observed an exchange between the [two] operators, who both returned to their vehicles and [left].

The 28 to the Subaru Outback has been added to this incident.

Happy Hunting

181

*Id.*

Defendant Bitca avers that at the time of Plaintiff's arrest, he "was aware that there had been complaints in the last month of suspected drug dealing in the Cumberland Farms parking lot which is adjacent to the Dunkin' Donuts parking lot, and that vehicles

involved in this suspected drug dealing had also been in the Dunkin' Donuts parking lot."
(Doc. 29-2 at 2, ¶ 10.)

### 3.  The March 7, 2016 Traffic Stop and Plaintiff's Arrest.

On March 7, 2016, at approximately 6:50 p.m., Defendant Bitca and Officer
Wyskiel responded in two separate police cruisers to a complaint of a male trespasser at
the Dunkin' Donuts on College Parkway in Colchester, Vermont. The trespasser was
described as a male in his thirties with long hair, wearing a blue jacket and boots. The
caller did not indicate the race of the trespasser or report "suspicious drug activity[.]"
(Doc. 38-7 at 18.)

Officer Wyskiel entered the Dunkin' Donuts through the front entrance while
Defendant Bitca drove to the parking lot behind the store. Officer Wyskiel radioed
Defendant Bitca to advise him that the male trespasser was in the back parking lot.

When Defendant Bitca pulled around to the back parking lot, he turned on his
spotlight (it was dark outside) and observed a green Subaru with its lights turned off
parked next to a dark Chevrolet Cobalt (the "Cobalt") with its lights turned on. Defendant
Bitca observed a woman exiting the driver side of the Subaru and at the same time the
Cobalt exiting the parking lot "in a hurry." (Doc. 29-2 at 2, ¶ 9.) Based on his training
and experience as a police officer, he "found the Cobalt's quick exit from the parking lot
the moment [he] pulled around the back and turned on [his] spotlight to be suspicious."
*Id.* at ¶ 11. There is no evidence that Defendant Bitca knew the number of the Cobalt's
occupants or was aware of their race when he pursued the vehicle.

Defendant Bitca followed the Cobalt out of the parking lot and observed that the
driver failed to use a turn signal when exiting. When the Cobalt used its brakes at an
intersection, Defendant Bitca noticed it had a defective right brake light. He initiated a
traffic stop of the Cobalt and activated the audio and video of his cruiser's dashboard
camera. Defendant Bitca approached the driver-side window, greeted the driver,
introduced himself, and asked for her license, registration, and proof of insurance. Ms.
Brace provided her name and these documents; she "identifies as Caucasian." (Doc. 1 at
3, ¶ 21.) Ms. Brace told Defendant Bitca that her home had recently burned down and she

was eager to get back to her children. When Defendant Bitca asked her where she was headed, she again mentioned that she was headed home to her children.

Defendant Bitca also greeted Plaintiff, who was seated in the Cobalt's front passenger seat. Plaintiff "identifies as African-American." *Id.* at 2, ¶ 5. Defendant Bitca asked Plaintiff if he had been at the Dunkin' Donuts and had gone inside, to which he responded: "um, I didn't want anything so I came out." (Doc. 31-4 at 4:08-11.) Defendant Bitca "found it odd that [Plaintiff] would have gone into Dunkin' Donuts but then decide he didn't want anything and leave." (Doc. 29-2 at 3, ¶ 14.)

Defendant Bitca explained to Ms. Brace and Plaintiff that he had been investigating a complaint about someone who was refusing to leave the Dunkin' Donuts and further explained that was why he pulled into the back parking lot. He then requested Plaintiff's identification. According to Defendant Bitca's testimony in a state court proceeding, he knew at this point that Plaintiff did not match the description of the trespass suspect. *See* Doc. 38-7 at 16-17. Defendant Bitca asked if Plaintiff and Ms. Brace had just talked to the other person in the parking lot and if they knew her. Plaintiff said "no, just saying 'hi' to her." (Doc. 31-4 at 4:52-53.) Ms. Brace repeated to Plaintiff that Defendant Bitca had asked if Plaintiff knew the woman, to which Plaintiff responded, "I kind of do" and described her as an "acquaintance." *Id.* at 4:54-58. Defendant Bitca described his suspicions at this juncture as follows:

> Because the Cobalt and the [green] Subaru had been parked behind the
> Dunkin' Donuts, even though the entrance to the restaurant was in the front,
> and that the occupants of the Cobalt did not purchase anything at Dunkin'
> Donuts but did interact with the driver of the [green] Subaru that they were
> parked alongside, I suspected that their reason for being in the back parking
> lot may not have been to patronize the Dunkin' Donuts but instead to
> interact with the person from the [green] Subaru.

(Doc. 29-2 at 3, ¶ 16.)

Plaintiff provided Defendant Bitca with a New York driver's license which identified him as Brandon Earl Romano. Defendant Bitca asked Ms. Brace if she still lived at the address on her license, 134 Pearl Street in Essex, Vermont and Ms. Brace confirmed she was still living at that address. Defendant Bitca was aware that Ms.

13

Brace's address was "very close" to a Dunkin' Donuts in Essex and perceived it as "odd that she would come all the way to Colchester to the Dunkin' Donuts on College Parkway when there was a much closer Dunkin' Donuts she could have visited." *Id.* at 4, ¶ 18. This "added to [his] suspicion that their reason for being in the back parking lot of Dunkin' Donuts was not to patronize the restaurant, but instead was to interact with the person from the [green] Subaru." *Id.*

After making contact with Officer Wyskiel regarding his stop of the green Subaru,[4] Defendant Bitca asked if the operator of the green Subaru had a passenger in her vehicle. Ms. Brace and Plaintiff responded she did not. Plaintiff volunteered that he had spoken to the driver of the green Subaru the day before and that she was currently homeless and had clothing in her car. Defendant Bitca found it "suspicious" that Plaintiff "would first deny that he knew the person, but then say that she was an acquaintance of his, and then later say he spoke with her and knew her to be homeless." (Doc. 29-2 at 3, ¶ 15.)

Defendant Bitca asked Plaintiff if he lived in Vermont or if he was visiting to which Plaintiff responded that he has "family here." (Doc. 31-4 at 7:37-44.) Defendant Bitca informed Plaintiff and Ms. Brace that he was going to check their operator's licenses, asked them to wait in their car, and told them he would be right back with them.

While in his police cruiser, Defendant Bitca contacted Officer Wyskiel and explained that he had observed the Cobalt parked next to the green Subaru and that it left Dunkin' Donuts in a hurry, which he characterized as "suspicious activity." *Id.* at 8:16-17. Officer Wyskiel asked if "anyone matched the description of what Dunkin' Donuts gave us," and Defendant Bitca responded "negative." *Id.* at 8:30-39; *see also* Doc. 38-6 at

---

[4] Defendant Bitca radioed Officer Wyskiel and asked, "Are you out with the Subaru station wagon?" (Doc. 31-4 at 6:11-20.) Officer Wyskiel responded, "I am." *Id.* at 6:24. Defendant Bitca asked if anyone else was in the car, and Officer Wyskiel confirmed there was not. *Id.* at 6:31-34. Defendant Bitca then asked: "Nothing in the car? Nothing at all?" *Id.* at 6:36-38. According to the video and audio recording from Officer Wyskiel's dashboard camera, Officer Wyskiel does not respond to this question and instead asks the operator of the green Subaru to call her brother (the owner of the green Subaru) to see if he had been walking through the Dunkin' Donuts drive-through. *See* Doc. 38-6 at 3:45-51.

5:35-38. Defendant Bitca queried if the "suspect we're looking for" was a "white male." (Doc. 31-4 at 8:40-45.) Officer Wyskiel responded that the suspect was "walking towards St. Mike's on College Parkway." *Id.* at 8:45-50; *see also* Doc. 38-6 at 5:45-54.

Defendant Bitca relayed Ms. Brace's and Plaintiff's operator's license information to dispatch and requested a "check." (Doc. 31-4 at 8:56-10:04.) Dispatch reported Ms. Brace's license was suspended but that there were no "records back out of New York" with regards to Plaintiff's license. *Id.* at 11:34-40. Defendant Bitca asked dispatch to check Plaintiff's "OLN," *id.* at 11:42-46, which dispatch reported was "valid out of New York" and "clear" at approximately nine minutes after the initiation of the traffic stop. *Id.* at 12:38-42.

While Defendant Bitca was interacting with Ms. Brace and Plaintiff, Officer Wyskiel was interacting with Jessica Kane, the sole occupant of the green Subaru. Ms. Kane advised that her brother, Jonathan, had left her vehicle and his whereabouts were unknown. Ms. Kane admitted that she was talking to a woman in another vehicle in the Dunkin' Donuts back parking lot that she thought she knew but discovered that she did not. She stated she assumed her brother had gone inside the Dunkin' Donuts. Ms. Kane described her brother as twenty years of age with short hair. Officer Wyskiel ran record checks on both Jessica and Jonathan Kane and discovered they both had suspended operator's licenses.

Officer Wyskiel asked Ms. Kane whether she was sleeping in her car and she explained the contents of her car were attributable to the fact that she was moving. Officer Wyskiel questioned Ms. Kane about the odor of marijuana and the pot pipe he spotted in the console of the green Subaru. He told Ms. Kane that her car "reeked" of marijuana and saw a hypodermic syringe in her purse. Ms. Kane advised she was now "clean" and turned over the paraphernalia in her purse which included hypodermic needles.

Defendant Bitca radioed Officer Wyskiel and asked: "What's the story of that female?" (Doc. 31-4 at 12:55-57.) Officer Wyskiel informed Defendant Bitca that the operator of the green Subaru had advised Officer Wyskiel that the vehicle belonged to her

brother and that he "just recovered some paraphernalia in the vehicle." *Id.* at 13:11-12.
Defendant Bitca, in turn, advised Officer Wyskiel that Plaintiff was an acquaintance of
the operator of the green Subaru; that they had just spoken; that their vehicles were
parked next to each other, one with the lights off and one with the lights on; and that their
activity in the back parking lot of the Dunkin' Donuts was suspicious.

> Defendant Bitca asserts that, at this point in the traffic stop, he believed:

> [B]ased on the email of reported drug dealing in the area, my knowledge
> based on my training and experience that fleeing an area quickly when law
> enforcement arrives may be indicative of criminal behavior, that an
> individual changing their story may be indicative of deception, and the
> information and observations I had up to that point, that I had a sufficient
> basis to investigate further my reasonable suspicion that the Cobalt
> occupants were engaged in illegal drug activity. These observations and
> information included: the suspicious interaction between the occupants of
> the Cobalt and the Subaru in the back parking lot of Dunkin' Donuts, with
> two cars next to each other in a manner similar to recent reports from the
> email of drug dealing in that area; the Cobalt leaving the parking lot
> quickly the moment I pulled around back and turned on my spotlight;
> Plaintiff saying he did not know the woman in the Subaru and only said
> "hi" to her but then saying she was an acquaintance and he had in fact
> spoken with her in the parking lot; that although Ms. Brace lived right near
> a Dunkin' Donuts in Essex, they had come to this Dunkin' Donuts in
> Colchester; that the Cobalt was parked in the back of the restaurant away
> from the entrance and that occupants did not buy anything at Dunkin'
> Donuts; and that Officer Wyskiel had recovered paraphernalia in the
> Subaru. I also knew at that point Ms. Brace's license was suspended and
> thus she would not be able to drive the vehicle.

(Doc. 29-2 at 4-5, ¶ 20.)

Approximately ten minutes after the initiation of the traffic stop, Defendant Bitca
returned to the driver's side of the Cobalt. He asked Ms. Brace and Plaintiff to be
"honest" and "straight up" with him (Doc. 31-4 at 14:02-08) and stated that based on his
training and experience, there was "definitely some suspicious activity that was going on
out back" in the Dunkin' Donuts parking lot when they had left quickly. He further
advised them that Officer Wyskiel had recovered "some items" from the green Subaru.
*Id.* at 14:15-30. He asked Ms. Brace and Plaintiff to be "straightforward" with him, and

"[j]ust think about you have kids[,]" and asked if there was anything illegal in the Cobalt or on their persons. *Id.* at 14:30-40. He advised Ms. Brace and Plaintiff that they had the right to refuse consent to a search and say "no" but that, in that event, he would have different options. *Id.* at 14:51-53. He informed Ms. Brace that her operator's license was suspended and that she could not drive the Cobalt. In response, Ms. Brace told him that her grandmother had paid her fines and asked Defendant Bitca to research the suspension further. Defendant Bitca again requested the occupants of the Cobalt be "straightforward" with him and said "[i]f there is any marijuana in the car, anything whatever, whatever the case is, I'd rather you just give it to me. You have the option to refuse me and ask for a search warrant or whatever, but I am just letting you guys know, the other officer found things in the other car." *Id.* at 15:22-42. He told them that "things are going to get complicated if you guys are not gonna cooperate with me." *Id.* at 15:49-52.

Defendant Bitca asked Plaintiff if there was anything illegal in the Cobalt or on his person. He inquired if they "underst[ood] how things look and why I'm asking you these questions?" (Doc. 31-4 at 16:02-10.) Defendant Bitca asked if Ms. Brace had an "issue" with him searching the Cobalt. *Id.* at 16:11-19. Both she and Plaintiff responded "no." *Id.* at 16:19-21. Defendant Bitca confirmed that they had "no issue at all[,]" *id.* at 16:12, and then radioed to Officer Wyskiel to come to the location of the traffic stop to render assistance.

Ms. Brace offered to pull into a parking lot to "make it easier for you guys, I don't—like I said I don't care if you search." *Id.* at 16:58-17:08. When Defendant Bitca asked if they knew that there had been another passenger in the green Subaru (an apparent reference to Ms. Kane's brother), they denied seeing another passenger. Ms. Brace advised that she was just asked to bring Plaintiff to the Dunkin' Donuts so he could get a drink, but they didn't have what he wanted, and that was "all [she] was doing." *Id.* at 17:16-25. Defendant Bitca perceived this as Ms. Brace's "attempt[] to distance herself from Plaintiff[.]" (Doc. 29-2 at 5, ¶ 24.) Defendant Bitca again asked the vehicle's occupants to be straightforward with him; stated "I know what's up, . . . this is not my first traffic stop"; and asked them "just don't make things more difficult." (Doc. 31-4 at

17

17:26-38.) He advised that "if there is any marijuana in the car, it's a civil violation and it's a ticket. What I am looking for is if you guys have pounds of marijuana, okay." *Id.* at 17:45. Laughing, Ms. Brace said if Defendant Bitca had pounds of marijuana, she would want him to be honest with her as well.

Defendant Bitca informed Ms. Brace that she was facing several tickets as a result of her suspended license, having a defective brake light, and not using a turn signal when leaving the Dunkin' Donuts parking lot. Ms. Brace described an issue she had with her tire and told Defendant Bitca that her vehicle had recently been thoroughly checked out and, at that time, the brake light was not defective. Throughout the conversation, she pointed out other operators who were driving vehicles with lights that were out.

Defendant Bitca explained to Ms. Brace and Plaintiff the process for the search and the need to wait for a backup officer to arrive. Plaintiff confirmed he had "no problem" with the search. Defendant Bitca advised that once back-up arrived, Ms. Brace and Plaintiff would both be asked to step out of the car. In the course of his conversation with Ms. Brace and Plaintiff, Defendant Bitca asked if they could see "how things add up to me." *Id.* at 19:54-57. Plaintiff said he understood that Defendant Bitca was just doing his job and he had no issue with it. Defendant Bitca asked: "Do you have any weapons? Any knives? Nothing sharp? Nothing that can hurt us? Nothing in your waistband and stuff like that" and then asked Ms. Brace "Same to you, miss?" *Id.* at 19:40. Both Ms. Brace and Plaintiff confirmed they had no weapons. Defendant Bitca asked if either Plaintiff or Ms. Brace were on probation or parole and questioned if a canine would alert on the Cobalt to which Plaintiff responded that there would be "no issue." *Id.* at 21:19-24.

As he waited for another officer to arrive at the scene, Defendant Bitca engaged in casual conversation with Ms. Brace and Plaintiff. He noticed Plaintiff "was active on his cell phone, his hands were visibly shaking, and he was nervously reaching around the vehicle more than he had been earlier in the encounter." (Doc. 29-2 at 6, ¶ 26.) Defendant Bitca "believed that Plaintiff's nervous behavior, which increased after consent to search was given, combined with other factors present during the stop, added to [Defendant Bitca's] reasonable suspicion that Plaintiff was engaged in illegal drug activity." *Id.* at 6,

¶ 27. Defendant Bitca asked Plaintiff to keep his hands where he could see them and suggested he place them in his lap. Ms. Brace reiterated that there was "no way" her license was suspended. Defendant Bitca told Plaintiff he would be able to drive the vehicle because his license was not suspended. Ms. Brace asked whether "all this is all stemming from" them being in a parking lot and Defendant Bitca confirmed that he was not asking for consent "out of the blue." (Doc. 31-4 at 27:27, 29:50.) Defendant Bitca asked Plaintiff if he had any property in the car to which Ms. Brace responded that Plaintiff did not have any property in the vehicle because the Cobalt belonged to her, she had just cleaned it, and she removed her children's belongings from it. Defendant Bitca told Ms. Brace and Plaintiff that he did not want to keep them longer than he had to, he reminded them that they had the option to refuse consent and he had to then decide whether to seize the Cobalt and seek a search warrant. Ms. Brace responded that it would be easier and quicker for her to allow the search and get it over with.

After Defendant Bitca radioed several times for backup, another cruiser arrived approximately thirty-three minutes after the initiation of the traffic stop. Defendant Bitca asked Plaintiff to "step out first" and informed Ms. Brace that he would "be right back" for her. *Id.* at 36:18-20. Plaintiff exited the Cobalt, but when Defendant Bitca requested that he come to the back of the vehicle, Plaintiff fled on foot. Defendant Bitca pursued Plaintiff on foot, shouting "stop" and threatening to tase him. During the pursuit, Plaintiff discarded a .40 caliber Smith & Wesson handgun as well as his jacket from which law enforcement recovered currency, five empty .40 caliber magazines, seventeen .40 caliber bullets, and a small plastic bag which contained a substance later determined to be cocaine. Throughout the encounter until the foot pursuit, Defendant Bitca was polite and courteous, speaking in a conversational tone without profanity or derogatory comments, and without any use, show, or threat of force.

A records check revealed that Plaintiff had provided a false name to Defendant Bitca and that he had "an active extraditable offense" from New York State. (Doc. 29-1 at 11, ¶ 52.) Defendant Morrison, the Town Police Chief, was not present for the traffic stop and did not participate in it.

19

### E.    Whether There Are Disputed Issues of Material Fact.

Although Plaintiff argues that his Statement of Disputed Material Facts
demonstrates a "substantial dispute regarding the true facts underlying [the] complaint"
(Doc. 38 at 2), Plaintiff contests only Defendant Bitca's perception of the undisputed
facts rather than their accuracy.[5] In a similar manner, Defendants challenge Plaintiff's
characterization of certain facts: (1) "Officer Bitca transformed [the] alleged trespassing
investigation into a drug investigation[,]" Doc. 38-1 at 2, ¶ 3; (2) "Despite having full
knowledge that [P]laintiff was not the male trespasser suspect, [Defendant Bitca]
unconstitutionally extended his investigative seizure of [P]laintiff[,]" id. at 8, ¶ 8; and
(3) "Officer Bitca impermissibly expanded his detention of the Cobalt and its occupants
notwithstanding the lack of any objective articulable suspicion to believe that either Ms.
Brace or [Plaintiff] was involved in any illegal activity." Id. at 9, ¶ 13.

Legal arguments and varying interpretations of undisputed facts do not give rise to
genuine issues of material fact that preclude summary judgment. See Anderson, 477 U.S.
at 248 ("Only disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment."); Timsina v.
United States, 2019 WL 3254689, at *2 (D. Vt. July 19, 2019) ("To the extent Plaintiffs'
responses to Defendant's statement of undisputed material facts are more properly

---

[5] For example, in responding to Defendants' statement that when Defendant Bitca pulled over
the Cobalt after it left the parking lot, Defendant Bitca did so in part due to "suspicions based on
observing the two vehicles parked next to each other in the back parking lot, and the quick nature
in which the Cobalt exited the parking lot the moment he arrived" (Doc. 29-1 at 5, ¶ 21), Plaintiff
disputes Defendant Bitca's concern about the trespassing complaint because these are
"generalized suspicions not rising to the requisite individualized articulable suspicion of criminal
activity required under the Fourth Amendment" and contends that the trespass investigation was
completed shortly after the traffic stop was initiated. (Doc. 38-1 at 8, ¶ 10.) Plaintiff also argues
that the February 9, 2016 email does not "give rise to any individualized particular suspicion of
drug dealing by [P]laintiff or anyone else that [Colchester Police Department] accosted and
detained on March 7, 2016" because the reported drug sales occurred one month earlier and in
the morning and the vehicles described in the email do not match the Cobalt and green Subaru.
Id. at 3, ¶ 3. Similarly, Plaintiff asserts that once Defendant Bitca initiated questioning regarding
possible drug activity, "given the totality of the circumstances, one must conclude that neither
[Ms.] Brace . . . nor [P]laintiff were free to leave the site of the motor vehicle seizure." Id. at 9,
¶ 14.

characterized as legal arguments, they will be disregarded because a legal argument cannot create a disputed fact under Fed. R. Civ. P. 56."). In this case, the facts are reflected in audio and video recordings which are the best evidence of what transpired. Competing inferences drawn from those recorded events do not render the events themselves disputed. *See Scott v. Harris*, 550 U.S. 372, 378 n.5 (2007) (directing that a court ruling on a motion for summary judgment must "allow the videotape to speak for itself.").

To the extent the parties dispute the fruits of the consent search, that dispute also does not preclude summary judgment. Plaintiff contends that the Town Police Department "conducted a full search of the Cobalt, and had a K-9 unit arrive and conduct a sniff of the vehicle, all without finding ANY evidence of contraband or any other criminal activity." (Doc. 38 at 7.) Defendant Bitca counters that when Plaintiff fled on foot, he discarded a firearm and cocaine and law enforcement found drug paraphernalia in the Cobalt.

Reasonable suspicion is determined by the totality of the circumstances at the time of the seizure and is not justified by what law enforcement officers discover later. The fruits of the search are therefore irrelevant because "[a] search prosecuted in violation of the Constitution is not made lawful by what it brings to light[.]" *Byars v. United States*, 273 U.S. 28, 29 (1927); *see also Zirlin v. Vill. of Scarsdale*, 365 F. Supp. 2d 477, 486 (S.D.N.Y. 2005), *aff'd*, 161 F. App'x 100 (2d. Cir. 2005) ("Hindsight is of course perfect, but the Defendants cannot be judged on what they know now or learned as a result of [an] investigatory stop."); *United States v. Wright*, 485 F.3d 45, 51 (1st Cir. 2007) ("It is a central tenet of Fourth Amendment jurisprudence that the fruits of a search cannot be used to establish that same search's validity.").

For the foregoing reasons, the court concludes that the operative facts are undisputed rendering summary judgment appropriate if Defendants establish they are entitled to judgment in their favor as a matter of law on Plaintiff's Fourth Amendment claim. *See* Fed. R. Civ. P. 56.

## F.   Plaintiff's State Court Proceedings.

Plaintiff was charged in Vermont Superior Court with providing false information to a police officer in violation of 13 V.S.A. § 1754(a); possession of a firearm in violation of 13 V.S.A. § 4017(a); possession of cocaine in violation of 18 V.S.A. § 4231(a)(1); and was charged as a fugitive from justice in violation of 13 V.S.A. § 4954. During those state court proceedings, Plaintiff moved to suppress the evidence obtained from the traffic stop and to dismiss the charges against him based on his contention that the traffic stop was unlawfully expanded into a drug investigation.

On November 14, 2016, after an evidentiary hearing, the Vermont Superior Court granted Plaintiff's motion to suppress and partially granted his motion to dismiss, ruling that, although it was "a close case," Defendant Bitca "did not have reasonable suspicion of drug activity[]" and was therefore "not justified in expanding the stop into a drug investigation." (Doc. 6-1 at 2, 7.) The Vermont Superior Court stated it did not "reach the attenuation argument raised by the State" (Doc. 29-7 at 1 n.1) but nonetheless ruled that "the State's attenuation arguments fail" because the court could not find that "[Plaintiff's] flight was either attenuated from the officer's unlawful expansion of the stop, or the result of an intervening circumstance[]" but instead "the evidence is clearly the product of exploitation of the original illegality." *Id.* at 7. It is not clear whether the Vermont Superior Court made this determination under Article 11 of the Vermont Constitution[6] or the Fourth Amendment to the United States Constitution or both.

Although the Vermont Superior Court granted Plaintiff's motion to suppress, it only partially granted his motion to dismiss and refused to dismiss Plaintiff's fugitive charge because he did not provide any case law supporting dismissal "due to an impropriety." *Id.* The Vermont Superior Court noted that it had already issued an entry order denying dismissal of that charge and it did "not see any reason to disturb that ruling at this time, particularly since [Plaintiff] ha[d] still not offered any legal support for his

---

[6] "Article 11 provides broader protection to individual rights than does the Fourth Amendment." *State v. Bryant*, 2008 VT 39, ¶ 14 n.2, 183 Vt. 355, 364, 950 A.2d 467, 473.

motion, as required by V.R.C.P. 47." *Id.* at 7-8.

The Vermont Superior Court's conclusion that the traffic stop was not supported by reasonable suspicion is not binding upon this court. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 85-86 (2d Cir. 2007) (holding district court erred in finding New York state criminal ruling regarding lack of probable cause precluded defendant law enforcement officers from asserting they had probable cause in federal civil lawsuit because officers were not parties to criminal proceedings and were not in privity with district attorney); *United States v. Miller*, 116 F.3d 641, 663 (2d. Cir. 1997) (holding "state court rulings in a criminal trial are not binding on a federal court because the state and national sovereignty are separate and distinct from one another") (internal quotation marks omitted); *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969) (finding state court's grant of motion to suppress arising out of same events underlying motion in federal court "was not binding on the federal judges").

## V.    Conclusions of Law and Analysis.

### A.    Whether to Grant Defendants' Motions for Partial Summary Judgment Regarding Plaintiff's Fourth Amendment Claim (Count I).

Defendant Bitca argues that he is entitled to judgment as a matter of law with regard to Plaintiff's Fourth Amendment claim because the traffic stop was lawful at its inception, he had reasonable suspicion that Plaintiff was engaged in criminal activity independent of the traffic stop, and Ms. Brace consented to a search of the Cobalt. Plaintiff concedes that Defendant Bitca had the authority to initiate the traffic stop, however, he asserts that Defendant Bitca unlawfully prolonged the traffic stop and commenced a drug investigation without reasonable suspicion of criminal activity in violation of *Rodriguez*.

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In the context of a traffic stop, "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a

23

ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Caballes*, 543 U.S. at 407). "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. The extent to which the traffic stop is prolonged is immaterial provided the "investigative inquiries unrelated to the traffic violations 'prolong[ed]—*i.e.*, add[ed] time to—the stop.'" *United States v. Gomez*, 877 F.3d 76, 91 (2d Cir. 2017) (quoting *Rodriguez*, 575 U.S. at 357) (alterations in original).

A traffic stop's "mission" generally involves "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "On-scene investigation into other crimes," including searches for drugs, "detours from that mission." *Id.* at 356. Such detours are constitutional only if law enforcement had "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Reasonable suspicion is not a "hunch" but is "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause[.]" *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotation marks omitted).

An investigatory stop requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot." *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018) (quoting *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)). "Conduct that is as consistent with innocence as with guilt may provide the basis for reasonable suspicion where there is some indication of possible illicit activity." *Id.*

The reasonable suspicion inquiry is an objective rather than a subjective one focusing on "whether a reasonable officer would suspect unlawful activity under the totality of the circumstances." *United States v. Diaz*, 802 F.3d 234, 239 (2d Cir. 2015). For this reason, Defendant Bitca's perceptions of conduct he considered "suspicious" or "deceptive" are relevant only to the extent they would be shared by a reasonably prudent police officer observing the same behavior. *See United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) ("Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant.").

24

In determining whether there is reasonable suspicion, law enforcement may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). "[W]hile a reviewing court cannot merely defer to police officers' judgment in assessing reasonable suspicion, the court must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (internal quotation marks omitted).

In determining reasonable suspicion, the court examines the totality of the circumstances rather than "the listed factors in isolation from each other[.]" *Arvizu*, 534 U.S. at 274; *see also Santillan*, 902 F.3d at 58 (rejecting "divide-and-conquer analysis" and ruling courts must "view each factor as part of the whole picture from which an officer draws certain common sense conclusions about human behavior") (citations and internal quotation marks omitted); *United States v. Allen*, 632 F. App'x 20, 21 (2d Cir. 2016) (noting Supreme Court has "expressly rejected" a "piecemeal approach to reasonable suspicion") (summary order).

Plaintiff argues that a jury, rather than the court, must decide whether Defendant Bitca unlawfully extended the traffic stop and asserts that a trier of fact is better positioned to consider "the veracity of the parties' testimonies" at trial. (Doc. 38 at 2.) Plaintiff is correct that "[t]he existence of reasonable suspicion is not a purely legal issue; rather, it is a mixed question of law and fact dependent on the totality of the circumstances[,]" *Gomez*, 877 F.3d at 92, however, where, as here, the material facts are undisputed, the question is purely one of law and summary judgment remains available. *See Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009) ("In the context of qualified immunity, determinations that turn on questions of law, such as whether the officers had . . . reasonable suspicion to support their actions, are appropriately decided by the court."); *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (holding when "the factual record is not in serious dispute . . . [,] [t]he ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law

25

better left for the court to decide") (alterations in original) (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)); *Brown v. City of Oneonta, N.Y.*, 235 F.3d 769, 775 n.2 (2d Cir. 2000) ("[W]hether a seizure has occurred—that is, whether a reasonable person would have felt free to leave—is a question of law for the court.").

Application of the foregoing standards to the instant case reveals that when Defendant Bitca responded to a complaint of a male refusing to leave Dunkin' Donuts, he was in the process of investigating a trespass. He was also aware of a citizen's report of suspected drug dealing on two occasions in the adjacent back parking lots of Cumberland Farms and Dunkin' Donuts. This citizen report, dated a month previously, was corroborated by complaints from Dunkin' Donuts employees regarding potential criminal activity in this same location. *See United States v. Elmore*, 482 F.3d 172, 183 (2d Cir. 2007) ("A tip from a citizen informant whose identity is disclosed (though not confirmed to a certainty) that is corroborated to a significant degree can support a finding of reasonable suspicion."); *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) ("In the case of an identified bystander with no apparent motive to falsify, . . . the information they provide has a peculiar likelihood of accuracy.") (internal quotation marks omitted).

Upon his arrival at Dunkin' Donuts with Officer Wyskiel, Defendant Bitca was told by a Dunkin' Donuts employee that the trespasser was in the back parking lot. Defendant Bitca drove his police cruiser to the back parking lot and observed two cars parked next to each other, one with its headlights on and one with its headlights off. When Defendant Bitca shone his spotlight, he saw a woman who had exited the green Subaru and he witnessed the Cobalt quickly leaving the Dunkin' Donuts parking lot.[7]

As Plaintiff concedes, thereafter, Defendant Bitca made a lawful stop of the Cobalt based on Ms. Brace's failure to use a turn signal and the Cobalt's defective brake light.

---

[7] "Although these parking-lot drug deals do not all 'go down' in identical fashion, they consistently share some common characteristics. Two people usually meet at a prearranged location in a public parking lot; one person gets into the vehicle of the other; the cash-for-drugs transaction occurs; and the individuals go their separate ways. From beginning to end, the typical parking-lot drug deal only takes about one or two minutes." *United States v. McCoy*, 513 F.3d 405, 407 (4th Cir. 2008).

*See Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ("[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation."). Although Plaintiff contends the stop was pretextual, a pretextual stop is permissible under the Fourth Amendment provided it is supported by an independent basis such as a traffic violation. *See United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) ("If an officer has observed a traffic violation, his actual motivation for stopping the vehicle is irrelevant to whether the stop is constitutionally reasonable."); *United States v. Miller*, 439 F. Supp. 3d 91, 98 (E.D.N.Y. 2020) ("A pretextual traffic stop . . . presents no constitutional issue, so long as the stop itself is supported by reasonable suspicion.").

Defendant Bitca's initial questioning addressed Ms. Brace's and Plaintiff's presence at the Dunkin' Donuts and the trespass as well as their interaction with the occupant or occupants of the green Subaru. In addition, Defendant Bitca sought and obtained Ms. Brace's operator's license, registration, and insurance as well as Plaintiff's operator's license. All of these activities were within the scope of the mission for the initial traffic stop and were therefore permissible. *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . [and] ask to examine the individual's identification . . . as long as the police do not convey a message that compliance with their requests is required.") (citations omitted); *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (holding law enforcement "may also ask about the purpose and itinerary of the occupants' trip" as "reasonably related in scope to [its] investigation of the circumstances that caused the stop").

Once Defendant Bitca observed that neither Ms. Brace nor Plaintiff matched the description of the trespasser, he ceased to have any grounds to prolong the traffic stop on that basis. Defendant Bitca returned to his police cruiser and asked dispatch to run license checks on the information Plaintiff and Ms. Brace discovered that Ms. Brace's operator's license was suspended, but the name Plaintiff provided was connected to a valid operator's license.

Defendant Bitca returned to the Cobalt, advised Ms. Brace of the status of her license, and explained to Plaintiff that the operator's license connected to the name he had provided was valid. This questioning was also related to the "mission" of the traffic stop and did not "measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 355 (quoting *Johnson*, 555 U.S. at 333). Defendant Bitca's ability to prolong the stop solely based upon the traffic violations lasted for only that amount of time in which he could reasonably have completed and issued traffic tickets or citations.[8] *See id.* at 354, 357 (noting constitutionality of traffic stop depends on when it "reasonably should have been" completed and not whether the drug investigation "occurs before or after the officer issues a ticket"). Defendant Bitca's prolongment of the traffic stop beyond this time period turns on whether in the course of his permissible activities he developed a reasonable suspicion of criminal activity based upon specific and articulable facts. Viewing the evidence in its totality, the court concludes that he did.

A citizen's tip of suspected drug dealing made only a month previously corroborated by complaints by Dunkin' Donuts employees regarding criminal activity in the back parking lot was sufficient to support a reasonable concern that the presence of the Cobalt and the green Subaru in the Dunkin' Donuts back parking lot at nighttime may have been for drug dealing purposes. In the course of the original mission of the traffic stop, Defendant Bitca discovered that Plaintiff had entered Dunkin' Donuts without purchasing anything[9] and determined that Plaintiff and Ms. Brace had traveled to a

---

[8] *See United States v. Clark*, 902 F.3d 404, 411 (3d Cir. 2018) (holding traffic stop reasonably should have been completed when officer "confirmed through the computerized check" that person in car "was authorized to drive the vehicle"); *United States v. Williams*, 2018 WL 1041559, at *9 (M.D. Ga. Feb. 23, 2018) (finding traffic stop prolonged under *Rodriguez* where "the driver has produced a valid license and proof that he is entitled to operate the car") (quoting *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993)).

[9] *United States v. Alexander*, 528 F. App'x 515, 519 (6th Cir. 2013) (finding observation that defendant "was parked next to a gas pump but never purchased gas" supported "the idea that he was at the gas station for some other purpose than purchasing gas"); *McCoy*, 513 F.3d at 408, 412-13 (determining reasonable suspicion existed to conduct *Terry* stop where two vehicles parked in the corner of a parking lot with "numerous available spaces between the store" and the cars, both vehicles traveled to another grocery store parking lot without their occupants entering the store, law enforcement knew the parking lots "were often meeting places for drug deals[,]"

Dunkin' Donuts in Colchester when one was "very close" to Ms. Brace's house. Defendant Bitca's belief that this path of travel was unusual and unexplained was reasonable.[10] Plaintiff acknowledged interacting with the occupant of the green Subaru and provided inconsistent explanations regarding his relationship with this person, including evidence that he had interacted with her on a prior occasion. At this point, Defendant Bitca had reason to believe that Plaintiff was being untruthful with him regarding his relationship to the operator of the green Subaru.[11]

When Plaintiff was able to describe the contents of Ms. Kane's vehicle and her status as homeless, Defendant Bitca reasonably suspected that the relationship between Plaintiff and Ms. Kane was not attenuated. By that time, Defendant Bitca had ruled out a business purpose for the Cobalt's continued presence in the back parking lot. He had also ruled out the likelihood that the meeting of the two vehicles in the back parking lot was coincidental.[12]

---

and one of the vehicles drove away from parking lot at a high rate of speed when law enforcement attempted to stop it).

[10] "Generally, questions about travel plans are ordinary inquiries incident to a traffic stop." *United States v. Campbell*, 970 F.3d 1342, 1356 (11th Cir. 2020); *see United States v. Santillan*, 902 F.3d 49, 57 (2d Cir. 2018) ("We have long recognized that reasonable suspicion may be based, at least in part, on an implausible story, an implausible explanation of the purpose of a trip, or a story that simply does not ring true.") (collecting cases); *United States v. Delille*, 2016 WL 236464, at *6 (D. Vt. Jan. 19, 2016) (finding defendant's provision of "a series of contradictory responses which rendered the purpose of his trip implausible" in response to questions regarding defendant's itinerary "gave rise to . . . indicia of potential criminal activity"); *United States v. Cordero*, 2014 WL 3513181, at *5 (D. Vt. July 14, 2014) (holding reasonable suspicion arose when defendant's "path of travel became indirect and circuitous which was further evidence of potential evasion").

[11] *See United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996) (citing inconsistent statements and nervous appearance as contributing to reasonable suspicion); *United States v. Swinger*, 2009 WL 311870, at *3 (D. Vt. Feb. 6, 2009) (citing "inconsistent statements" as supporting "reason to believe there might be contraband or evidence of a crime in the car").

[12] *See United States v. Hollaman*, 811 F. App'x 740, 743 (3d Cir. 2020) (observing that once an experienced police officer had ruled out the possibility that "the young white man pacing in the Hilltop Inn parking lot was waiting on . . . a ride" because he spent "only thirty seconds in [a] car with . . . tinted windows," an experienced police officer could investigate further because he had the "minimal level of objective justification needed to support reasonable suspicion.") (internal quotation marks omitted).

Ms. Kane, in turn, acknowledged to Officer Wyskiel that she had interacted with the occupants of the Cobalt although she claimed this was an instance of mistaken identity. She provided inconsistent explanations for her presence in the Dunkin' Donuts parking lot stating both that she was looking for her brother and did not know his whereabouts coupled with a suggestion that her brother had been inside the Dunkin' Donuts. Officer Wyskiel found drug paraphernalia in the green Subaru together with the pervasive smell of marijuana.[13] He communicated with Defendant Bitca about his conversation with Ms. Kane and advised him that paraphernalia had been found.

Based on specific and articulable facts, Defendant Bitca lawfully questioned Ms. Brace and Plaintiff regarding his suspicions surrounding their presence in the Dunkin' Donuts back parking lot, asking only those questions necessary to confirm or dispel his belief that it was related to illegal drug activity.[14] In the course of his questioning, Defendant Bitca noticed that Ms. Brace seemed to be distancing herself from Plaintiff and disclaiming any role beyond transporting him to the Dunkin' Donuts.

After repeatedly encouraging the occupants of the Cobalt to be "honest" and "straightforward" with him, Defendant Bitca obtained both occupants' consent to a search of the Cobalt notwithstanding his repeated assurances that they had the right to

---

[13] *See United States v. Churchill*, 792 F. App'x 39, 42 (2d Cir. 2019) (finding recovery of drug paraphernalia from defendant's residence pursuant to previously executed search warrant supported reasonable suspicion to extend traffic stop) (summary order); *United States v. Cohen*, 593 F. App'x 196, 203 (4th Cir. 2014) (holding "officers had reasonable suspicion to detain [defendant] beyond the lawful traffic stop" where defendant "was found in possession of drug paraphernalia during the traffic stop") (per curiam); *Binder v. Cold Spring Harbor Cent. Sch. Dist.*, 2010 WL 3257708, at *6 (E.D.N.Y. July 19, 2010), *report and recommendation adopted*, 2010 WL 3257849 (E.D.N.Y. Aug. 13, 2010) (holding search of backpack was supported by reasonable suspicion where school officials found "empty plastic bags, a cigarette, and what was later determined to be drug paraphernalia" in plaintiff's pockets).

[14] *See United States v. Carter*, 2015 WL 13374007, at *7 (D. Vt. Nov. 4, 2015), *aff'd*, 675 F. App'x 100 (2d Cir. 2017) (holding traffic stop was justifiably prolonged when the questions law enforcement "asked and the answers he received gave rise in short order to a reasonable suspicion of a drug dealing offense").

30

refuse to consent.[15] Once consent to search was received, Defendant Bitca noticed that Plaintiff was active on his cell phone and visibly nervous, with his hands shaking. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (recognizing "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) (holding defendant's "nervous condition" and "difficulty in answering basic questions" contributed to reasonable suspicion). Any further delay thereafter was attributable to a wait for back up to conduct the search and was permissible under *Rodriguez*. *See United States v. Burwell*, 763 F. App'x 840, 851 (11th Cir. 2019) (holding that under *Rodriguez*, once consent to search is lawfully obtained, police officers may "call[] for back up, brief[] [other officers] on the situation when [they] arrive[], direct[] [occupants] out of [the] vehicle, and pat[] [them] down" because these delays "are the sort of 'negligibly burdensome precautions' tolerated by the Fourth Amendment.") (quoting *Rodriguez*, 575 U.S. at 356).

Prior to performing a consent search of the Cobalt, Defendant Bitca was entitled to ask the occupants of the Cobalt if they had any weapons on their persons, whether they were on probation or parole, and to ask them to exit the Cobalt while it was searched. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (holding police officers may order a driver to exit a vehicle that was lawfully detained without violating the Fourth Amendment's prohibition of unreasonable searches and seizures); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (extending *Mimms* and holding "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."); *United States v. Stewart*, 473 F.3d 1265, 1267, 1269 (10th Cir. 2007) ("Before opening the door and letting Mr. Stewart out of the vehicle, [the police officer] asked Mr. Stewart if he had any weapons or contraband in the vehicle that [the officer] needed to be concerned about. . . . [T]he content of police questions during a lawful detention does not implicate

---

[15] Defendant Bitca was not required to advise the Cobalt's occupants of their right to refuse consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").

the Fourth Amendment as long as those questions do not prolong the detention.").

When Defendant Bitca asked Plaintiff to step out of the Cobalt, Plaintiff complied with this request and immediately fled the scene. *See Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion[.]"). Plaintiff was pursued, seized, and arrested.

"[I]n determining whether [an] officer acted reasonably[,]" the court must give "due weight" to the "specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *see also Santillan*, 902 F.3d at 56 ("We view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training.").

> Reasonable suspicion is a less demanding standard than probable cause not
> only in the sense that reasonable suspicion can be established with
> information that is different in quantity or content than that required to
> establish probable cause, but also in the sense that reasonable suspicion can
> arise from information that is less reliable than that required to show
> probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990).

Viewing the undisputed facts in the light most favorable to Plaintiff and examining the evidence as a whole rather than piecemeal, the totality of the circumstances establishes that Defendant Bitca lawfully prolonged the traffic stop based on a reasonable and articulable suspicion, informed by his training and experience, that one or more of the occupants in the Cobalt may have been engaged in drug trafficking with the occupant of the green Subaru from which drug paraphernalia had been recovered. He was therefore entitled to prolong the traffic stop on that basis and inquire further. Against this backdrop, no Fourth Amendment violation may be found.

Where no constitutional violation is found, the court proceeds no further with a qualified immunity analysis. *See Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) ("If a plaintiff cannot make the first showing, *i.e.*, a violation of constitutional rights, no further inquiry is necessary because where there is no viable constitutional claim,

defendants have no need of an immunity shield.") (internal quotation marks omitted); *Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir. 2002) ("If we determine that the officer's conduct did not violate a constitutional right, we proceed no further and hold that the officer is entitled to qualified immunity."). For this reason, the court GRANTS Defendant Bitca's motion for summary judgment on Plaintiff's Fourth Amendment claim (Count I).

Correspondingly, where there is no underlying constitutional violation, there can be no municipal liability. *See Raspardo v. Carlone*, 770 F.3d 97, 129 (2d Cir. 2014) ("Because we have held that there was no underlying constitutional violation, there is also no supervisory liability"); *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (holding that because *Monell* "*extends* liability to a municipal organization" rather than provides "a separate cause of action[,]" the district court's "decision not to address the municipal defendants' liability under *Monell*" on summary judgment "was entirely correct" where the court "properly found no underlying constitutional violation"). The court therefore GRANTS Defendant Morrison's and the Town's motions for summary judgment on Plaintiff's Fourth Amendment claim as well.

## B. Whether to Grant Defendants' Motions to Dismiss Plaintiff's Remaining Claims.

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants move to dismiss Plaintiff's Fourteenth Amendment Equal Protection Clause, Title VI, and Article 11 of Vermont's Constitution claims. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff must allege sufficient facts to "nudge[] [his] claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010)

33

(internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (quoting *Twombly*, 550 U.S. at 555). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

As a preliminary matter, Defendants urge the court to find Plaintiff has abandoned any claim not addressed in his opposition, however, courts generally do not dismiss a claim solely on the basis of a failure to oppose dismissal. *See McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal."). As a result, Plaintiff's silence on a particular issue will not be treated as an abandonment of his remaining claims.

### 1.    Whether Plaintiff Has Plausibly Pled a Violation of the Fourteenth Amendment's Equal Protection Clause (Count II).

Defendant Bitca moves to dismiss Plaintiff's claim that Defendant Bitca's order directed to him but not Ms. Brace to exit the Cobalt constituted racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. He argues that Plaintiff does not plausibly allege disparate treatment or a facially neutral law that was applied discriminatorily and asserts only threadbare allegations of discriminatory intent.

"To state a race-based [§ 1983] claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff may allege a prima facie intentional discrimination claim by "plead[ing] the existence of a similarly situated group that was treated differently." *Pyke v. Cuomo*, 258

F.3d 107, 109 (2d Cir. 2001) (citations and internal quotation marks omitted). A plaintiff must allege that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion[.]" *Hu v. City of N.Y.*, 927 F.3d 81, 91 (2d Cir. 2019). The identified comparator must "bear a reasonably close resemblance" to Plaintiff and be "similarly situated in all material respects[.]" *Id.* at 96 (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) and *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

The recording from Defendant Bitca's dashboard camera reveals that Defendant Bitca advised Plaintiff and Ms. Brace that he would ask *both of them* to exit the Cobalt and that after Plaintiff exited the Cobalt, Defendant Bitca stated he would "be right back" for Ms. Brace. (Doc. 31-4 at 36:18-20.) Where the allegations of a complaint conflict with a video or audiotape, the authenticity of which is not disputed, the latter prevails. *See Kass v. City of N.Y.*, 864 F.3d 200, 206 (2d Cir. 2017) ("[W]hen the record includes a video that the parties concede is authentic and accurate, as is the case here, we view the allegations of the complaint as true only 'to the extent that they are not contradicted by video evidence.'") (quoting *Garcia v. Does*, 779 F.3d 84, 88 (2d Cir. 2015)). Plaintiff's allegations that Defendant Bitca ordered Plaintiff to exit the Cobalt "because of his perceived race" therefore cannot be credited as true. (Doc. 1 at 9, ¶ 71.) In their absence, Plaintiff has failed to plausibly allege the essential elements of a disparate treatment claim. *See Iqbal*, 556 U.S. at 678 (holding a complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement") (alteration and internal quotation marks omitted); *Morales v. New York*, 22 F. Supp. 3d 256, 275 (S.D.N.Y. 2014) ("Plaintiff's conclusory allegations of disparate treatment and his personal opinion that such treatment was motivated by discriminatory intent are not enough to prevail on a § 1983 claim for a violation of the Equal Protection Clause.").

A plaintiff may alternatively plead a violation of the Equal Protection Clause by identifying "a facially neutral law or policy that has been applied in an intentionally discriminatory manner" or a "facially neutral statute or policy [that] has an adverse effect

and . . . was motivated by discriminatory animus." *Pyke*, 258 F.3d at 109 (quoting *Brown*, 221 F.3d at 337). Although a plaintiff "is not obligated to show a better treated, similarly situated group of individuals of a different race[,]" *id.* at 110, he or she still must assert that "defendants harbored a discriminatory intent against" him or her in addition to disparate impact. *Hayden v. Cty. of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999). Discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). A mere "difference in race between the person stopped [for a traffic violation] and the officer" does not "establish[] a prima facie case of racial discrimination." *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (internal quotation marks omitted).

Plaintiff asserts that Defendant Bitca "applied a facially neutral law in an intentional and unlawful manner" (Doc. 1 at 9, ¶ 73) but does not identify the neutral law that was discriminatorily applied. The Complaint is also bereft of plausible allegations of discriminatory intent. Defendant Bitca is not alleged to have used any racial slurs, made derogatory comments, engaged in harassment, or made any threat, show, or use of force. *Compare Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) (holding allegations that individual "became physically abusive and hit plaintiff in the face while using racial epithets and referring to plaintiff's religion" raised inference of discriminatory animus), *and Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) ("[R]acial epithets coupled with harassment are sufficient to support a cause of action under the Equal Protection Clause."), *with Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 470 (2d Cir. 2006) (dismissing equal protection claim where "[t]here is nothing in the record . . . to suggest that race played a role in [the Board of Elections'] decision").

Because Plaintiff has not plausibly alleged the essential elements of a disparate treatment claim under either theory, the court GRANTS Defendant Bitca's motion to dismiss Plaintiff's Equal Protection claim (Count II) for failure to state a claim for which relief may be granted under Fed. R. Civ. P. 12(b)(6). In turn, because Plaintiff's Equal

Protection claims against Defendant Morrison and the Town are predicated on their "fail[ure] to properly instruct, supervise, or train Defendant Bitca" and their promulgation of a *de facto* policy, practice, or custom of discriminating against individuals which caused the deprivation of Plaintiff's rights (Doc. 1 at 10, ¶¶ 79-80), the court GRANTS their motions to dismiss this claim as well.

### 2.    Whether Plaintiff Has Plausibly Pled the Town Violated Title VI (Count III).

In Count III of his Complaint, Plaintiff alleges that the Town violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* The Town seeks dismissal of this claim, asserting it cannot be held liable for Defendant Bitca's actions under a theory of *respondeat superior*. In his opposition, Plaintiff asserts that he has stated enough facts to establish the "Town's deliberate indifference rose to the level of official policy[.]" (Doc. 17 at 6.)

Title VI affords a private right of action only for intentional discrimination, *see Alexander v. Sandoval*, 532 U.S. 275, 293 (2001), and requires a plaintiff to "plausibly . . . allege that (1) the action was discriminatory based on race, color, or national origin; (2) such discrimination was intentional; and (3) the discrimination was a 'substantial or motivating factor' for defendants' actions." *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001). "Liability under Title VI . . . cannot be imputed to institutions based on the actions of their employees." *Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007); *see also Foster v. Mich.*, 573 F. App'x 377, 389 (6th Cir. 2014) (holding "there is no vicarious liability under Title VI" and dismissing complaint against employees that did "not contain any fact-based allegations that either [defendant or State employers] participated in, was aware of, or was deliberately indifferent to any discriminatory acts"). As a result, to the extent Plaintiff grounds his Title VI claim on a theory of *respondeat superior*, that claim must be DISMISSED.

37

To the extent that Plaintiff seeks to ground his Title VI claim on the Town's alleged *de facto* policy of discrimination, he must assert "(1) substantial control, (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference[.]" *Alexander v. Hunt*, 2018 WL 3801240, at \*7 (D. Vt. Aug. 9, 2018) (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012)). "[O]nly deliberate indifference" by Town officials "can be viewed as discrimination by" the Town itself. *Zeno*, 702 F.3d at 666 (internal quotation marks omitted).

Plaintiff's Title VI allegations arise from a single incident which generally does not give rise to a *de facto* policy or practice of intentional discrimination. *See Lachaab v. State Univ. of N.Y. Bd. of Trs.*, 715 F. App'x 73, 74 (2d Cir. 2018) (holding that plaintiff's "description of a single incident in which his classmates made disparaging comments" regarding his religion, "although unfortunate," did not suffice to "show the 'severe and discriminatory harassment' necessary for Title VI liability") (summary order); *Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 292 (E.D.N.Y. 2002) (holding that comment regarding there being "too many blacks" at defendant institution was "certainly offensive, but is a single incident that does not rise to the level of severity necessary to make out a [Title VI] claim") (internal quotation marks omitted). This is particularly true where there are no nonconclusory allegations related to discriminatory intent. *See Kajoshaj v. N.Y.C. Dep't of Educ.*, 543 F. App'x 11, 14 (2d Cir. 2013) (affirming dismissal of Title VI claim where plaintiffs did not "assert that any defendant referenced their religion or national origin, much less that they did so in a derogatory manner").

Plaintiff's allegations that Defendant Bitca expanded the traffic stop and asked Plaintiff to exit the Cobalt "on the basis of race[,]" (Doc. 1 at 11, ¶ 87) do not alter the conclusion that dismissal is required because they are contradicted by video and audio evidence. *See Kass*, 864 F.3d at 212 (reversing denial of motion for judgment on the pleadings where "video clearly contradicts" allegations). All that remains are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[]" that do not suffice to state a plausible claim for relief. *Iqbal*, 556 U.S. at

678.

To the extent Plaintiff relies on Vermont traffic data which he contends "shows a measurable disparity in [the Town Police Department's] rates of seizing and searching black versus white drivers[,]" (Doc. 1 at 11, ¶ 88) this data does not establish a cause of action on Plaintiff's behalf because disparate impact alone does not establish intentional discrimination. *See Guardians Ass'n v. Civil Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 602-03 (1983) ("[C]ompensatory relief . . . is not available as a private remedy for Title VI violations not involving intentional discrimination."); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014) ("Private individuals who bring suits under Title VI may not recover compensatory relief unless they show that the defendant engaged in intentional discrimination."). In any event, Plaintiff lacks standing to bring a claim that does not allege a violation of his own rights under Title VI. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (noting standing "is an essential and unchanging part of the case-or-controversy requirement of Article III."); *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990) ("[A] litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (internal quotation marks omitted).

Accepting Plaintiff's nonconclusory factual allegations as true and drawing all rational inferences in his favor, Plaintiff has not plausibly alleged that the Town had a *de facto* policy or practice of intentionally discriminating against motorists of color sufficient to state a claim for relief under Title VI. The court therefore GRANTS the Town's motion to dismiss Count III.

### 3. Whether the Court Should Exercise Supplemental Jurisdiction over Plaintiff's Claim for Violation of Article 11 of the Vermont Constitution (Count IV).

In Count IV of his Complaint, Plaintiff alleges that Defendants violated Article 11 of the Vermont Constitution because Defendant Bitca impermissibly extended the traffic stop into a drug investigation and ordered Plaintiff to exit the Cobalt without "reasonable suspicion of danger or the commission of a crime" in violation of *State v. Sprague*, 2003

VT 20, 175 Vt. 123, 824 A.2d 539 (2003). (Doc. 1 at 12, ¶ 96.) Plaintiff further asserts that Defendant Morrison and the Town failed to properly instruct, supervise, or train Defendant Bitca "concerning the rights of citizens in Vermont" and sanctioned a *de facto* policy, practice, or custom of "removing persons of color from vehicles during traffic stops at a higher rate than white drivers as evidenced by road-side collection data[.]" *Id.* at 13, ¶¶ 100-01. These removals purportedly "occurred . . . as the direct result of Defendants' unchecked racial biases[.]" *Id.* at ¶ 101.

Defendants argue that Plaintiff has failed to plausibly plead a claim for damages under Article 11 because he prevailed in his motion to suppress in the Vermont Superior Court, providing him with a meaningful alternative remedy, and because he does not plausibly plead that Defendant Bitca violated clearly established law or acted in bad faith.

When a court has "dismissed all claims over which it has original jurisdiction," it may "decline to exercise supplemental jurisdiction" over a state law claim if it determines that the interests of justice support that result. 28 U.S.C. § 1367(c). In the Second Circuit, a district court should not dismiss a claim "without affording the parties notice or any opportunity to be heard" unless "it is unmistakably clear that the court lacks jurisdiction, or that the complaint lacks merit or is otherwise defective[.]" *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018) (internal quotation marks omitted). However, "an opportunity to be heard on whether to exercise supplemental jurisdiction may be inherent in the course of pre-trial proceedings such as those resolving motions to dismiss or for summary judgment[,]" and thus the court "need not provide a separate opportunity to be heard beyond the briefing and resolution of such motions." *Id.* at 84; *see also Rosario v. Town of Mount Kisco*, 2020 WL 764280, at *9 n.5 (S.D.N.Y. Feb. 14, 2020) ("Courts in this district have routinely interpreted [*Catzin*] to include situations where there has been briefing related to these types of motions.") (collecting cases).

In deciding whether an exercise of supplemental jurisdiction is appropriate, the court must consider a "balance of factors" including "judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he discretion implicit

in the word 'may' in subdivision (c) of § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."). In "the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citation omitted); *see also Cohill*, 484 U.S. at 351 ("When the single federal-law claim in the action was eliminated at an early stage of the litigation, the District Court had a powerful reason to choose not to continue to exercise jurisdiction."); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."). Although the court may grant leave to amend with regard to Plaintiff's Equal Protection and Title VI claims, Plaintiff has not affirmatively requested that it do so and it is not clear that better pleading will resurrect those claims in light of the recording of the traffic stop which negates key aspects of Plaintiff's version of the events. *See Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.").

This case is not set for trial and no discovery has occurred to date other than with regard to Plaintiff's Fourth Amendment claim which has been dismissed. *See Kolari*, 455 F.3d at 123 (holding district court erred in exercising jurisdiction over state-law claims where plaintiffs' "federal-law claims were eliminated . . . prior to the investment of significant judicial resources") (footnote omitted). There is also no evidence that "refusing to hear [Plaintiff's] state law claim[] would lead to a substantial inconvenience or unfairness." *Morton v. Cty. of Erie*, 796 F. App'x 40, 44 (2d Cir. 2019) (affirming decision not to exercise supplemental jurisdiction over state law due process claims after granting summary judgment on federal due process claims) (summary order); *see also Bentz v. City of N.Y.*, 249 F. Supp. 3d 640, 644 (E.D.N.Y. 2017) ("[E]ven where considerable resources have been expended and the potential for inconvenience is substantial, a district court may forgo exercising supplemental jurisdiction over pendent state law claims if the federal ones are discovered to be patently meritless[.]") (internal

quotation marks omitted).

The Vermont Supreme Court has recently recognized "an implied private right of action for damages . . . available directly under Article 11[]" based upon "a showing that a law enforcement officer acting within the scope of the officer's duties either acted with bad faith or knew or should have known that those actions violated clearly established law." *Zullo v. State*, 2019 VT 1, ¶ 3, 209 Vt. 298, 306, 205 A.3d 466, 472. The reach of *Zullo* is not clear because, as Defendants point out, a private action does not lie where a "meaningful alternative remedy" is available. *See Zullo*, 2019 VT 1, at ¶¶ 38, 55, 209 Vt. at 323, 333, 205 A.3d at 484, 491 (holding that a claim under Zullo requires both a showing that "there is no meaningful alternative remedy in the context of that particular case[]" and explaining that although the ordinary recourse for an unconstitutional traffic stop is suppression of the evidence, "[t]he standard remedy for an Article 11 violation in a criminal context—the exclusionary rule—provides no relief to the instant plaintiff, who was not charged with a crime."). In this case, although Plaintiff was able to obtain suppression of the evidence against him, he achieved only a partial dismissal of the criminal charges against him. Under *Zullo*, it is not clear whether this mixed outcome will suffice as a "meaningful alternative remedy." *Id.*

The unique nature of the Vermont Supreme Court's jurisprudence with regard to Article 11 warrants caution in deciding Plaintiff's claim in federal court. What is impermissible under Article 11 is often lawful under federal law. For example, Plaintiff's Article 11 claim rests on an alleged violation of *State v. Sprague* which holds that a law enforcement officer may not order the occupants out of a vehicle "unless 'the objective facts and circumstances would support a reasonable suspicion that the safety of the officer, or of others, was at risk or that a crime has been committed.'" *Zullo*, 2019 VT 1, at ¶ 72, 209 Vt. at 343, 205 A.3d at 498 (quoting *Sprague*, 2003 VT 20, at ¶ 16, 175 Vt. at 129, 824 A.2d at 545)). In contrast, pursuant to the United States Constitution, law enforcement may order a driver "to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures" after the vehicle "has been lawfully detained for a traffic violation[.]" *Mimms*, 434 U.S. at 111 n.6. Vermont

courts are better positioned to decide whether Defendant Bitca's exit order and other conduct during the traffic stop violated Article 11. *See Gibbs*, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

Because exercising supplemental jurisdiction over an Article 11 claim would require the court to decide the contours of a novel issue of state law and because the Second Circuit has "repeatedly held that a district court particularly abuses its discretion when it retains jurisdiction over state-law claims raising unsettled questions of law following dismissal of all original-jurisdiction claims[,]" *Kolari*, 455 F.3d at 124,[16] considerations of judicial economy, convenience, fairness, and comity weigh in favor of declining supplemental jurisdiction over Plaintiff's Article 11 claim (Count IV). The court therefore DISMISSES that claim without prejudice. Plaintiff may refile his Article XI claim in state court if he so desires.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motions for partial summary judgment on Plaintiff's Fourth Amendment claim (Count I) (Docs. 29-31) and GRANTS their motions to dismiss Plaintiff's Fourteenth Amendment Equal Protection Clause claim (Count II) and Title VI claim (Count III). (Docs. 6-8.) The court declines to exercise supplemental jurisdiction over Plaintiff's Article 11 claim (Count IV) and DISMISSES that claim WITHOUT PREJUDICE.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _30th_ day of September, 2020.

Christina Reiss, District Judge
United States District Court

---

[16] *See also Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) ("Where a pendent state claim turns on novel or unresolved questions of state law, . . . principles of federalism and comity may dictate that these questions be left for decision by the state courts. This is particularly true if the federal claim on which the state claim hangs has been dismissed.") (citation omitted).